UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

MICHAEL DENTON,

               Plaintiff,

    v.

TIM TRASHER, et al.,

               Defendants.

CASE NO. 3:18-CV-5017-BHS-DWC

REPORT AND RECOMMENDATION

Noting Date: April 10, 2020

      The District Court has referred this action, filed pursuant to 42 U.S.C. § 1983, to United States Magistrate Judge David W. Christel. Before the Court are Plaintiff's and Defendants' Motions for Summary Judgment. Dkt. 120, 121.

      Plaintiff has failed to sufficiently rebut Defendants' summary judgment showing. Therefore, the Court recommends Plaintiff's Motion for Summary Judgment be denied and Defendants' Motion for Summary Judgment be granted. The Court also recommends denying Plaintiff's Motion Re Lack of Access to Attorney (Dkt. 133) as moot.

## BACKGROUND

      In his Fourth Amended Complaint (the "Complaint"), Plaintiff, a prisoner confined at Washington State Penitentiary ("WSP") in Walla Walla, Washington, alleges his constitutional

rights were violated when he was retaliated against, his incoming mail was rejected, he was denied adequate medical care related to his mental health illness, and he was deprived of sanitation items and access to a toilet while housed in observation cells.  Dkt. 116. Plaintiff also alleges his rights were violated pursuant to Title II of the Americas with Disabilities Act ("ADA") and the Rehabilitation Act ("RA") based on his mental illness.

Plaintiff names the following as Defendants: Timothy Thrasher, DOC's Mission Housing Administrator and Associate Superintendent of Stafford Creek Corrections Center; Karie Rainer, the DOC's Director of Mental Health and psychologist; Jamie Davis, a psychology associate; David McKinney, Plaintiff's classification counselor; Randal Keith Goodenough, a former DOC psychology associate; Lindsay McIntyre, a psychology associate; Scott Russell, Superintendent or the Deputy Director of Prison Command A for the DOC; correctional officers Tammy O'Reilly, Richard Scholl, Daniel Bayer, William Fletcher, and Sheldon Moore; and the State of Washington.[1]  Dkt. 116.

On December 5, 2019, both Plaintiff and Defendants filed Motions for Summary Judgment. Dkts. 120 ("Plaintiff's Motion"), 121 ("Defendants' Motion"). The parties filed responses and replies to the Motions. Dkt. 124, 126, 129, 131.

## MOTION RE LACK OF ACCESS TO ATTORNEY (DKT. 133)

On February 21, 2020, Plaintiff, proceeding *pro se,* filed a "Motion re Lack of Access to Attorney." Dkt. 133. Defendants filed a Response on February 27, 2020. Dkts. 135, 136. Plaintiff filed his Motion *pro se*, although he is represented by an attorney in this matter. *See id.*

---

[1] Plaintiff also names Robert Herzog as a defendant in this action but fails to make any allegations against him. Dkt. 116. On December 19, 2018, the Court directed Plaintiff to file a third amended complaint but directed Plaintiff he "shall not list Mr. Herzog as a defendant in the caption or in the body of the complaint." Dkt. 63. The Court previously dismissed claims against Mr. Herzog and several other individuals because Plaintiff failed to allege personal participation. Dkts. 21, 26. Therefore, the Court will not consider any claims against Mr. Herzog.

1    Per Local Rule 83.2(b)(5), when a party is represented by an attorney of record in a case, the

2    party cannot appear or act on his or her own behalf in that case. Therefore, the Court

3    recommends Plaintiff's Motion Re Lack of Access to Attorney (Dkt. 133) be denied as moot.

4    **SUMMARY JUDGMENT STANDARD OF REVIEW**

5        Pursuant to Rule 56 of the Federal Rules of Civil Procedure, "the court shall grant

6    summary judgment if the movant shows that there is no genuine dispute as to any material fact

7    and the movant is entitled to judgment as a matter of law." A party asserting a fact cannot be or

8    is genuinely disputed must support the assertion by:

9        (A) citing to particular parts of materials in the record, including

10       depositions, documents, electronically stored information, affidavits
or declarations, stipulations (including those made for purposes of the
motion only), admissions, interrogatory answers, or other materials;

11       or
(B) showing that the materials cited do not establish the absence or

12       presence of a genuine dispute, or that an adverse party cannot produce
admissible evidence to support the fact.

13

14    Fed. R. Civ. P. 56(c)(1). All facts and reasonable inferences drawn therefrom must be viewed in

15    the light most favorable to the nonmoving party. *Furnace v. Sullivan*, 705 F.3d 1021, 1026 (9th

16    Cir. 2013) (citing *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011)); *Tarin v.*

     *County of Los Angeles*, 123 F.3d 1259, 1263 (9th Cir. 1997).

17

18        As the party moving for summary judgment, Defendants have the initial burden to

19    demonstrate no genuine issue of material fact remains in this case. *Celotex Corp. v. Catrett*, 477

20    U.S. 317, 325 (1986); *In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th Cir.

21    2010). The movant "always bears the initial responsibility of informing the district court of the

22    basis for its motion," and identifying those portions of the record, including pleadings, discovery

23    materials, and affidavits, "which it believes demonstrate the absence of a genuine issue of

24    material fact." *Celotex*, 477 U.S. at 323. Mere disagreement or the bald assertion stating a

genuine issue of material fact exists does not preclude summary judgment. *California Architectural Building Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987). A "material" fact is one which is "relevant to an element of a claim or defense and whose existence might affect the outcome of the suit," and the materiality of which is "determined by the substantive law governing the claim." *T.W. Electrical Serv., Inc. v. Pacific Electrical Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

Mere "[d]isputes over irrelevant or unnecessary facts," therefore, "will not preclude a grant of summary judgment." *Id.* Rather, the nonmoving party "must produce at least some 'significant probative evidence tending to support the complaint.'" *Id.* (*quoting Anderson*, 477 U.S. at 290); *see also California Architectural Building Products, Inc.*, 818 F.2d at 1468 ("No longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment."). In other words, the purpose of summary judgment "is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888 (1990). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment if the motion and supporting materials--including the facts considered undisputed--show that the movant is entitled to it[.]" Fed R. Civ. P. 56(e)(3).

When parties file cross-motions for summary judgment, as the parties have done here, each motion "must be considered on its own merits." *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). The court must review the evidence submitted in support of each cross-motion. *Id.* And, although the parties may each assert there are no uncontested issues of material fact, the Court must determine whether disputed issues of material fact are present. *Id.*; *Osborn v. Butler*, 712 F. Supp. 2d 1134, 1148 (D. Idaho 2010).

1

**DISCUSSION**

2       Plaintiff alleges Defendants violated his First Amendment rights when he was retaliated

3 against and his incoming mail was rejected, and Defendants were deliberately indifferent to

4 Plaintiff's serious medical needs when Plaintiff was denied access to adequate mental health

5 treatment, placed him in solitary confinement, and a close observation area ("COA") cell. Dkt.

6 116. Plaintiff also alleges violations of the ADA and RA. *Id.* Plaintiff seeks summary judgment

7 on liability. Dkt. 120.

8       Defendants contend they provided Plaintiff with adequate medical care, Plaintiff's pre-

9 January 5, 2015 claims are barred by the statute of limitations, Plaintiff's classification and

10 prison placements are constitutional, Plaintiff cannot demonstrate retaliation or a violation of his

11 First Amendment rights based on the rejection of his incoming mail, Plaintiff cannot demonstrate

12 the DOC violated the ADA or RA, Plaintiff cannot show personal participation of several

13 Defendants, and Defendants are entitled to qualified immunity. Dkt. 121. Defendants assert;

14 therefore, they are entitled to summary judgment dismissing Plaintiff's Complaint with

15 prejudice. *Id.*

16

17

18

19

20

21

22

23

24

REPORT AND RECOMMENDATION - 5

1    A.  Evidence[2][3]

2        The following is derived from the allegations in Plaintiff's Complaint, Defendants'

3    Answer, and all declarations and other records submitted on the record and referred to by the

4    parties in their filings for the Court's consideration on the parties' summary judgment Motions.

5    *See* Dkt. 94, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108, 111, 116, 119, 120, 121, 122,

6    127, 128, 130, 132. The following facts are undisputed by the parties or, following the Court's

7    review, have been deemed undisputed for purposes of the pending Motions.

8        Plaintiff was out of Department of Corrections ("DOC") custody from July 2013 to June

9    21, 2016. Dkt. 108 at 3 (Thrasher Declaration). He now is currently serving a sentence for four

10   counts of custodial assault. Dkt. 108 at 3. Upon readmission, Plaintiff was housed for several

11   weeks at the Washington Corrections Center ("WCC") Intensive Management Unit ("IMU") and

12   hospital. *Id.* On July 22, 2016, Plaintiff was assigned to maximum custody ("max custody"). Dkt.

13   108 at 3.

14       Individuals are referred to max custody through use of the Custody Facility Plan ("CFP"),

15   which is initiated at the facility level and must be approved by the DOC Headquarters Maximum

16   Custody Committee ("maximum custody committee"). Dkt. 108-1 at 2-15. Informal

17

18

19   _____

20       [2] The Court will discuss more detailed evidence as it pertains to each individual Defendant when
     determining if there is a genuine issue of material fact as to whether each Defendant violated Plaintiff's
     constitutional rights. *See, supra.*

21       [3] In support of their Motion, Defendants submitted the following evidence: (1) Declarations of Rebecca
     Citrak, Jamie Davis, William Fletcher, Randal Keith Goodenough, Lindsay McIntyre, David McKinney, Sheldon

22   Moore, Tammy O'Reilly, Karie Rainer, Richard Scholl, Timothy Thrasher, Allison Window, Daniel Bayer, Chris
     Bowman, and Defendant's Counsel Haley Beach; (2) Plaintiff's deposition; (4) portions of Plaintiff's DOC records;
     (5) portions of DOC policies; and (6) Plaintiff's mental health treatment notes.

23       Plaintiff submitted the following evidence is support of his Motion: (1) Declaration of Plaintiff and exhibits
     attached; (2) Declaration of Darryl Parker, Plaintiff's counsel, and exhibits attached; (3) Declaration of James

24   Moseley; and (4) additional records and files. Dkt. 120.

classification reviews are held every sixty days, and formal reviews are held at intervals of 180 days or less. *Id.* at 11-12.

On August 24, 2016, WCC staff recommended a CFP with Plaintiff's placement in close custody, the highest level of custody in the general population. Dkt. 108 at 4, Exhibit 6. On September 16, 2016, the Multi-Disciplinary Team ("MDT"), which included Defendant Thrasher, maintained Plaintiff on max custody, transferred him to Stafford Creek Corrections Center ("SCCC"), and required him to program and work with mental health staff. Dkt. 108 at 4; 108-1 at 114-22. In December 2016, the MDT, including Defendant Thrasher, voted to transfer Plaintiff to the Monroe Correctional Complex ("MCC") IMU. Dkt. 108 at 4; 108-1 at 124-27. Plaintiff was housed at MCC for less than a month in December 2016. Dkt. 108-1 at 48.

On December 28, 2016, Plaintiff left DOC custody for criminal proceedings. Dkt. 108-1 at 48. In February 2017, Plaintiff met with Dr. Anthony Eusanio for a psychological evaluation. Dkt. 127 (Plaintiff's Declaration) at ¶ 9. The purpose of Dr. Eusanio's report was to provide an evaluation of Plaintiff's capacity related to his pending criminal charges of custodial assault. *Id., Exhibit A.*

On June 7, 2017, Plaintiff returned to the MCC IMU, where he had been housed prior to departure for criminal proceedings, following his conviction of four counts of custodial assault. Dkt. 108 at 4-5. Plaintiff was moved to a COA cell on June 14, 2017. Dkt. 106-1 at 70. Individuals may be placed in the COA for these reasons: risk of self-harm; risk of suicide; self-harm attempt; suicide attempt; or severe psychiatric decompensation. Dkt. 94 (Bowman Declaration) at 2.

On June 15, 2017, a Psychiatric Progress Note reported Plaintiff moved to the COA "because of threats of self-harm" and noted that he "ha[d] been agitated, angry, demanding, and

1  disruptive in the COA." Dkt. 106-1 (Rainer Declaration) at 70. In late June 2017, Defendant

2  Thrasher spoke with Plaintiff along with a psychologist. Dkt. 108 at 4-5. Plaintiff shared his

3  mental health concerns and requested he be transferred to the Special Offender Unit ("SOU"). *Id.*

4  Individuals who are assigned to max custody can be considered for placement in a Residential

5  Treatment Unit such as the SOU. *Id.* Defendant Thrasher shared this information with

6  appropriate mental health staff. *Id.* Placement in the SOU requires approval from the Mental

7  Health Care Review Committee ("CRC"). Dkt. 108 at 5. Defendant Rainer is the chair of the

8  CRC. *Id.*

9        On June 29, 2017, Defendant O'Reilly processed a mail rejection of an incoming issue of

10  "Bottles and Modelz" magazine addressed to Plaintiff. Dkt. 105 (O'Reilly Declaration) at 1-3;

11  105-1.

12        In July 2017, Defendant Thrasher received Dr. Eusanio's psychological evaluation. Dkt.

13  108 at 5. Defendant Thrasher shared the report with the appropriate mental health staff, including

14  Defendant Rainer. Dkt. 108 at 5.

15        In September 2017, a CFP was initiated by MCC staff. Dkt. 108 at 5, Exhibit 9. Plaintiff

16  indicated he only wanted to go to SOU. *Id.* Plaintiff's counselor noted Plaintiff had spent most of

17  time at MCC in the COA. *Id.* Mental health provider and non-party Vilma Khounphixay

18  indicated Plaintiff's time in the COA was for "behavioral issues that are with secondary

19  incentives to manipulate his surroundings. [Plaintiff] does not suffer from a major mental health

20  diagnosis (S-2 Code)." Dkt. 108 at 5, Exhibit 9. After Plaintiff returned from state court custody

21  in June 2017, he accumulated 16 serious infractions including 4 staff assaults. *Id.* Plaintiff was

22  reported to have been disrupting the MCC IMU and refused mental health treatment. *Id.* at 6,

23  Exhibit 9.

24

REPORT AND RECOMMENDATION - 8

1    The MDT, including Defendants Thrasher and Rainer, voted to maintain Plaintiff on max

2   custody, transfer him to the Washington State Penitentiary ("WSP") IMU, and stated if Plaintiff

3   "can maintain appropriate behavior for 60 days, transfer to MCC-SOU will be considered." Dkt.

4   108-1 at 139. Plaintiff arrived at WSP on September 25, 2017. Dkt. 106-1 at 84.

5    In November 2017, WSP staff initiated a CFP noting Plaintiff had requested to be

6   transferred back to the MCC SOU and recommended the transfer. Dkt. 108 at 6. On December

7   29, 2017, the MDT recommended Plaintiff be transferred to the MCC SOU. Dkt. 108 at 6,

8   Exhibit 11. Shortly after the December 29, 2017 decision, the MDT learned Plaintiff was placed

9   in the COA several times in late December 2017. Dkt. 106-1 at 96-99, 108 at 6. The same day

10  the decision was made, Plaintiff had been disruptive and was infracted on December 30 and 21,

11  2017. Dkt. 108 at 6. On December 31, 2017, Plaintiff was on suicide watch at WSP in a COA

12  cell. Dkt. 106-1 at 98; 107 at 1-2. As a result, a decision on Plaintiff's placement in SOU was

13  deferred. *Id.* at 6-7.

14    On March 6, 2018, WSP staff recommended Plaintiff be considered for transfer to MCC

15  SOU. Dkt. 108 at 7; 108-1 at 154-58. The MDT, which included Defendants Thrasher and

16  Rainer, voted to maintain Plaintiff on max custody at WSP IMU and required him to complete

17  "Achieve Your Potential (AYP)," a program which teaches skills to promote to lower

18  custody levels and live safely in general population. Dkt. 108 at 7, Exhibit 12.

19    In July 2018, Plaintiff was transferred to the WCC IMU. Dkt. 108 at 7-8. WSP staff

20  noted it may be beneficial for Plaintiff to have a change of scenery as he had been very active

21  over the past few weeks and disrupting the facility's operations. *Id.* at 7-8.

22    Shortly thereafter, WCC staff requested Plaintiff's transfer to the MCC SOU. The CFP

23  stated: "No programs have been completed while at WCC. He has been unable to maintain his

24

1  levels.  His behavior on MAX has been difficult. 7 negative Behavior log entries while at

2  WCC-IMU.  Two serious (*see* OMNI) infractions while at WCC-IMU." Dkt. 108 at 7-8.

3  Plaintiff was placed in the COA at WCC, which prompted a reevaluation of his S-code, which

4  was changed from 2 to 3. Dkt. 106 at 6. An emergent conference was held, and Plaintiff was

5  transferred to the MCC SOU on or around October 24, 2018. Dkt. 106 at 6. At MCC, Plaintiff

6  was housed in the IMU at the MCC SOU and remained in solitary confinement. Dkt. 127 at ¶

7  28. On September 20, 2019, Plaintiff was transferred back to the WSP IMU where he remains

8  today. *Id.* at ¶¶ 28-29.

9       **I.       Pre-January 5, 2015 Claims, Classification Status, and Retaliation**

10        In their Motion, Defendants argue the statute of limitations bars Plaintiff's claims

11  predating January 5, 2015; Plaintiff fails to state a due process claim; and Plaintiff fails to state a

12  retaliation claim against Defendant McIntyre. Dkt. 121 at 13-16. In his Response to Defendants'

13  Motion, Plaintiff does not challenge that any claims predating January 5, 2015 are subject to

14  dismissal. Dkt. 126. Plaintiff concedes he makes no Fourteenth Amendment due process claim,

15  "nor does he argue that his [m]ax custody housing assignment violates the Eighth Amendment."[4]

16  Dkt. 126 at 10. Plaintiff concedes he has not alleged a retaliation claim against Defendant

17  McIntyre and only alleges she was deliberately indifferent with respect to his mental health

18  treatment. Dkt. 116, 126.

19        Therefore, the Court recommends granting Defendant's Motion and dismissing Plaintiff's

20  pre-January 5, 2015 claims, Fourteenth Amendment due process claims, Eighth Amendment max

21  custody claim, and retaliation claims against Defendant McIntyre with prejudice.

22  _____

23       [4] Rather, Plaintiff asserts the conditions of his housing assignments and their influence on his mental illness
violate the Eighth Amendment as they constitute cruel and unusual punishment. Dkt. 126 at 10. This argument will

24  be addressed with respect to Plaintiff's Eighth Amendment claims. *See supra.*

1    **II.    Exhaustion – December 31, 2017 Claims**

2    Defendants allege Plaintiff failed to exhaust the administrative remedies available to him as

3    to the events of December 31, 2017.[5] Dkt. 121. Plaintiff contends he exhausted all administrative

4    remedies, and he did not receive a response to the emergency grievance he submitted. Dkt. 126 at

5    13; Dkt. 127.

6    A.  *Legal Standard*

7    Before a prisoner may bring a civil rights action under 42 U.S.C. § 1983, he must first

8    exhaust all available administrative remedies. Under the Prison Litigation Reform Act of 1995

9    ("PLRA"),

10   > No action shall be brought with respect to prison conditions under section 1983 of
>    this title, or any other Federal law, by a prisoner confined in any jail, prison, or other

11   > correctional facility until such administrative remedies as are available are exhausted.

12   42 U.S.C. § 1997e(a). Exhaustion in cases covered by § 1997e(a) is mandatory. *Booth v. Churner*,

13   532 U.S. 731, 739 (2001). The mere fact a plaintiff has filed an initial grievance under a prison's

14   grievance policy does not satisfy the PLRA exhaustion requirement; a plaintiff must exhaust *all*

15   levels of an available grievance procedure before he can initiate litigation. *See id.* at 736-41; *Porter*

16   *v. Nussle*, 534 U.S. 516, 524-25 (2002). Even when the prisoner seeks relief not available in

17   grievance proceedings, notably money damages, exhaustion is still a prerequisite to suit. *Booth*,

18   532 U.S. at 741. If a claim is not exhausted, it must be dismissed. *McKinney v. Carey*, 311 F.3d

19   1198, 1199 (9th Cir. 2002).

20   Failure to exhaust administrative remedies is properly brought as a summary judgment

21   motion. *Albino v. Baca*, 747 F.3d 1162, 1168 (9th Cir. 2014). Once the defendant proves there was

22

23   [5] On December 31, 2017, Plaintiff was on suicide watch at WSP in a COA cell. Dkt. 106-1 at 98; 107 at 1-
2. Plaintiff alleges Defendants Moore, Bayer, and Fletcher ordered or permitted correctional staff to allow Plaintiff

24   to commit self-harm for several hours without intervention. Dkt. 116 at 3.

1    an available administrative remedy and the offender failed to exhaust the available remedy, the

2    burden shifts to the plaintiff. The plaintiff must show there was something about his claim which

3    made the "existing and generally available administrative remedies effectively    unavailable to

4    him." *Williams v. Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015) (citing *Hilao v. Estate of Marcos*,

5    103 F.3d 767, 778 n.5 (9th Cir. 1996)).

6        B.   *Declaration of Rebecca Citrak – Defendant's Evidentiary Objections*

7            In support of their Motion, Defendants submit the declaration of Rebecca Citrak, an

8    administrative assistant with the DOC. Dkt. 98, 121. Plaintiff contends Paragraph 8 of Citrak's

9    declaration (related to Grievance #18647444) is hearsay, not based on personal knowledge, and is

10   expert opinion without foundation and should be stricken. Dkt. 126 at 12. In their Reply, Defendants

11   argue the evidence presented is admissible and the Court can consider it. Dkt. 131.

12           In determining admissibility for summary judgment, the Court considers the contents of

13   the evidence rather than its form. *Fraser v. Goodale,* 342 F.3d 1032, 1036–37 (9th Cir. 2003). If

14   the contents of the evidence could be presented in an admissible form at trial, those contents may

15   be considered on summary judgment even if the evidence itself is hearsay. *Id.* The Ninth Circuit,

16   however, has "repeatedly held that 'documents which have not had a proper foundation laid to

17   authenticate them cannot support [or defend against] a motion for summary judgment.'" *Beyene*

18   *v. Coleman Sec. Servs., Inc.,* 854 F.2d 1179, 1182 (9th Cir. 1988) (quoting *Canada v. Blain's*

19   *Helicopters, Inc.,* 831 F.2d 920, 925 (9th Cir. 1987)).

20           Hearsay statements in affidavits are inadmissible. *Japan Telecom, Inc. v. Japan Telecom*

21   *Am. Inc.,* 287 F.3d 866, 875 n.1 (9th Cir. 2002). Hearsay is any out-of-court statement, whether

22   oral or written, offered in evidence to prove the truth of the matter asserted. Fed. R. Evid. 801(a),

23   (c). Absent a procedural rule or statute, hearsay is inadmissible unless it is defined as non-

24

hearsay under Federal Rule of Evidence 801(d) or falls within a hearsay exception under Federal Rule of Evidence 803, 804, or 807. *See* Fed. R. Evid. 802. When a statement is hearsay within hearsay, or double hearsay, each statement must qualify under some exemption or exception to the hearsay rule. Fed. R. Evid. 805; *U.S. v. Arteaga,* 117 F.3d 388, 396 n.12 (9th Cir. 1997).

Plaintiff's argument Ms. Citrak's declaration is hearsay and lacks personal knowledge is unavailing. Defendants do not present Ms. Citrak's declaration and the contents of Grievance #18647444 to prove the truth of a matter asserted in the grievance. Rather, Ms. Citrak's declaration is offered to demonstrate Plaintiff did not file any other grievances related to the December 31, 2017 events and did not file an appeal. Accordingly, the Court declines to strike Paragraph 8 of Ms. Citrak's declaration on hearsay grounds.

C.  *Defendants' Evidence*

Defendants' evidence shows prisoners in the custody of the DOC may file administrative grievances pertaining to several routine matters, including conditions of confinement, staff conduct, or retaliatory conduct. Dkt. 98 (Citrak Declaration) at ¶ 4. Prisoners may also file emergency grievances when there is a potentially serious threat to the life or health of an inmate or staff member, or involve a potential threat to the orderly operation of a facility. *Id.* at ¶ 8. Under DOC policy, the grievance procedure consists of four levels of review. *Id.* at ¶ 5. Both routine and emergency grievances are initially filed at Level 0. *Id.* At Level 0, the facility's "grievance coordinator pursues informal resolution, returns the complaint to the offender for rewriting, returns the complaint to the offender requesting additional information, or accepts the complaint and processes it as a formal grievance." *Id.* After satisfactory review of the informal grievance at Level 0, the grievance coordinator accepts routine and emergency grievances as formal grievances at

Level I and complaints alleging staff misconduct at Level II. *Id*. If the Level 0 grievance is informally resolved, an inmate may appeal the informal resolution if he is not satisfied. *Id.*

If the grievance proceeds beyond Level 0, the grievance coordinator issues a formal response at Level I. *See id*. A prisoner may appeal the denial of either a routine or emergency grievance to the superintendent of the facility at Level II. *See id*. "Inmates may appeal all Level II responses (except emergency grievances) to Department Headquarters in Tumwater, where they are re-investigated." *Id*. Level III is the final level of review. *Id*.

Here, evidence shows Plaintiff filed an emergency grievance against Defendants Fletcher, Moore, and Scholl, but was instructed to re-write his grievance because it did not satisfy procedural requirements. Dkt. 98-1 (Grievance #18647444). Grievance #18647444 was filed on January 1, 2018 and transcribed by non-party correctional officer Morris due to Plaintiff's restraint bed placement. *Id.* In the grievance form, Plaintiff alleges Defendants Moore, Fletcher, and Scholl retaliated against Plaintiff, failed to protect Plaintiff, and told Plaintiff to kill himself. *Id.* Plaintiff complains he was in a suicide observation cell bleeding and cutting himself and banging his head on the cell for several hours. *Id.* Plaintiff states Defendants Moore and Fletcher instructed Defendant Scholl to "do nothing." *Id.*

The grievance form states it was received by the facility office on January 2, 2018 and a box stating "Additional information or rewrite needed (See below). Return within 5 working days or by: 01/17/2018." *Id.* In the explanation section, the form states, "This does not meet the criteria of an emergency complaint and will be processed as routine. Lt. Long #7164[.] Address only 1 issue per form." *Id.* The form indicates a rewrite was not received on January 17, 2018. *Id.* The form is signed by "K. Walker CS2." Plaintiff did not re-submit his grievance related to

1    the events of December 31, 2017 or file any appeals. Dkt. 98 at ¶ 8. Rather, on January 5, 2018,

2    Plaintiff filed this action. *See* Dkt. 1.

3          Based on the evidence detailed above, the Court finds Defendants carried the initial burden

4    of showing the absence of exhaustion in this case with respect to the events of December 31, 2017.

5    The undisputed evidence presented by Defendants shows there was a grievance procedure in place

6    at the time of the incidents on December 31, 2017. Plaintiff, however, did not complete the

7    grievance process for the events of December 31, 2017.

8          D.    *Plaintiff's Response*

9          The burden now shifts to Plaintiff, "who must show that there is something particular in his

10   case that made the existing and generally available remedies effectively unavailable to him by

11   'showing that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or

12   obviously futile.'" *Williams v. Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015) (quoting *Albino*, 747

13   F.3d at 1172). Acts by prison officials preventing the exhaustion of administrative remedies may

14   make administrative remedies effectively unavailable. *See Nunez v. Duncan*, 591 F.2d 1217, 1224-

15   25 (9th Cir. 2010). "The ultimate burden of proof, however, remains with the defendants," and the

16   evidence must be viewed in the light most favorable to the plaintiff. *Paramo*, 775 F.3d at 1191

17   (citing *Albino*, 747 F.3d at 1172). The Supreme Court held there are three circumstances in which

18   an administrative remedy is not capable of potential relief:

19         First, an administrative procedure is unavailable when it operates as a simple dead
     end—with officers unable or consistently unwilling to provide any relief to aggrieved

20         inmates. Next, an administrative scheme might be so opaque that it becomes,
     practically speaking, incapable of use—i.e., some mechanism exists to provide relief,

21         but no ordinary prisoner can navigate it. And finally, a grievance process is rendered
     unavailable when prison administrators thwart inmates from taking advantage of it

22         through machination, misrepresentation, or intimidation.

23   *Ross v. Blake*, 136 S. Ct. 1850, 1853–1854 (2016).

24

1    Plaintiff does not dispute his awareness of the grievance process. Dkt. 126, 127. However,

2    he alleges he never received Grievance #18647444 after it was submitted, and even if he had, the

3    "vague comments on the form make it impossible for him to determine what he needed to change

4    or add to make the form appropriate for processing." Dkt. 126 at 12. However, Plaintiff has not

5    demonstrated why he did not file a regular (non-emergency) grievance regarding the December

6    31, 2017 events or why the grievance process was unavailable to him.

7    Even assuming Plaintiff did not receive a response to Grievance #18647444 after it was

8    submitted, this evidence does not show the grievance process was effectively unavailable to

9    Plaintiff. Plaintiff is not permitted to determine exhaustion futile but is obligated to treat a

10   grievance as denied and file an appeal. *Booth v. Churner,* 532 U.S. 731, 741 n. 6 (2001). *See also*

11   *Jones v. Sandy,* 2006 WL 355136 (E.D. Cal. Feb. 14, 2006). ("[W]e stress the point ... that we

12   will not read futility or other exceptions into statutory exhaustion requirements where Congress

13   has provided otherwise."); *Buckley v. Pearsons,* 2011 WL 3022539, at *2 (S.D. Miss. May 25,

14   2011), *adopted*, 2011 WL 3022531 (S.D. Miss. July 22, 2011) (federal inmate who did not

15   receive response to informal resolution request, but who did not appeal to next level of review,

16   did not exhaust); *See White v. McGinnis,* 131 F.3d 593, 595 (6th Cir. 1997) (if prisoner does not

17   receive timely response to grievance, and higher-stage appeal is available, then prisoner must file

18   an appeal in order to exhaust claim)*; Tubach v. Lahimore*, 2012 WL 4490792, at *3 (E.D. Cal.

19   Sept. 28, 2012) ("The vague assertion that [plaintiff's] grievances were not processed and that

20   Defendant was stopping them from being processed is insufficient to make the requisite showing

21   that exhaustion either occurred or was excused due to some form conduct on the part of prison

22   officials which rendered the appeals process unavailable.").

23

24

1       Lastly, Plaintiff argues, even if he had received Grievance #18647444, the instructions

2  were "vague" and "impossible" for Plaintiff to determine what changes he needed to make. Dkt.

3  126 at 13. This argument also lacks merit. As discussed, the evidence fails to support that

4  Plaintiff was prevented from initiating or completing the grievance process in a timely manner or

5  that he lacked the means to pursue the process through to a final appeal, had he chosen to do so.

6  *See Woodford v. Ngo,* 548 U.S. 81, 90-91 (2006) ("Proper exhaustion demands compliance with

7  an agency's deadlines and other critical procedural rules because no adjudicative system can

8  function effectively without imposing some orderly structure on the course of its proceeding.").

9  Plaintiff's conclusory assertions fail to provide any specific facts to support his allegations and

10  are insufficient to excuse his failure to exhaust. In sum, Plaintiff fails to present sufficient

11  evidence to raise a question of fact the grievance process was unavailable to him.

12       As Plaintiff did not fully follow the proper grievance procedures available, he has not

13  overcome Defendants' showing that he failed to exhaust administrative remedies available to him.

14  Therefore, the Court concludes Plaintiff failed to properly exhaust the claims alleged in the

15  Complaint related to the events of December 31, 2017, and these claims should be dismissed

16  without prejudice. *Wyatt v. Terhune*, 315 F.3d 1108, 1120 (9th Cir. 2003) *overruled on other*

17  *grounds by Albino,* 747 F.3d at 1162 ("If the district court concludes that the prisoner has not

18  exhausted nonjudicial remedies, the proper remedy is dismissal of the claim without prejudice.");

19  *Carrea v. California*, 551 F. App'x 368, 369 (9th Cir. 2014) (remanding for the entry of

20  dismissal without prejudice because the proper remedy for non-exhaustion is dismissal without

21  prejudice). Accordingly, the Court recommends Defendants' Motion be granted as to the events on

22  December 31, 2017.

23

24

1   **III.  Eighth Amendment**

2     Plaintiff alleges his conditions of confinement in the COA and inadequate mental health

3 treatment violated his Eighth Amendment rights. Dkt. 116.

4     The Constitution does not mandate comfortable prisons, but neither does it permit

5 inhumane prisons. *Farmer v. Brennan*, 511 U.S. 825, 832 (1970). Under the Eighth Amendment,

6 prison officials are required to provide prisoners with basic life necessities, such as food, clothing,

7 shelter, sanitation, medical care, and personal safety. *Id.*; *Toussaint v. McCarthy*, 801 F.3d 1080,

8 1107 (9th Cir. 1986). The circumstances, nature, and duration of a deprivation of these

9 necessities must be considered in determining whether a constitutional violation has occurred.

10 *Johnson v. Lewis,* 217 F.3d 726, 731 (9th Cir. 2000) (precluding summary judgment where

11 prison officials wholly restricted inmates access to toilets for an entire night, resulting in inmates

12 soiling themselves).

13     To state a claim for unconstitutional conditions of confinement, a plaintiff must allege a

14 defendant's acts or omissions deprived the inmate of "the minimal civilized measure of life's

15 necessities" and the defendant acted with deliberate indifference to an excessive risk to inmate

16 health or safety. *Allen v. Sakai,* 48 F.3d 1082, 1087 (9th Cir. 1994) (quoting *Farmer,* 511 U.S. at

17 834); *see Estate of Ford v. Ramirez—Palmer,* 301 F.3d 1043, 1049–50 (9th Cir. 2002). "To violate

18 the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state

19 of mind." *Farmer*, 511 U.S. at 834 (internal quotations omitted). "In prison-conditions cases th[e]

20 state of mind is one of 'deliberate indifference' to inmate health or safety[.]" *Id.* (*citing Wilson v.*

21 *Seiter*, 501 U.S. 294, 302-03 (1991)). A prison official does not act with deliberate indifference

22 "unless the official knows of and disregards an excessive risk to inmate health or safety." *Farmer,*

23 511 U.S. at 837.

24

a.  *Mental Health Treatment*

Plaintiff alleges by continuing to place him in max custody despite its impact on Plaintiff's mental health, Defendants were deliberately indifferent. Dkt. 116, 120.

It is "settled that 'the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.' " *Farmer*, 511 U.S. 832 (quoting *Helling v. McKinney*, 509 U.S. U.S. 25, 31 (1993)). The Eighth Amendment imposes positive duties on prison officials, who must provide humane conditions of confinement. *Id.* (citations omitted). A prison official violates this aspect of the Eighth Amendment if the alleged deprivations are objectively " 'sufficiently serious.' " *Id.* at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)) (other citations omitted). Regarding this first requirement, "a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.' " *Id.* (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Prisoners may have a right not to be in indefinite solitary confinement. *See Wilkinson v. Austin*, 245 U.S. 109, 224 (2005) (holding indefinite confinement in a supermax facility violates due process).

In *Cano v. Taylor*, 739 F.3d 1214 (9th Cir. 2014), the prisoner-plaintiff alleged he had not received adequate treatment for his mental illness, and as a result, he became suicidal. The Ninth Circuit was presented with evidence demonstrating the plaintiff was regularly seen by mental health care staff for his complaints, including evidence of numerous visits by psychologists and psychiatrists over a several year period. *Id.* at 1217-18. The record also demonstrated the plaintiff was an uncooperative and difficult patient, "his suicide threats were manipulative in nature," and the violent and threatening behavior he often exhibited meant that he could not be placed in a lower custody part of the prison. *Id.* at 1218. The Ninth Circuit concluded that, on

1  this record, no reasonable trier of fact could find that there was deliberate indifference to the

2  plaintiff's complaints about his mental health needs. *Id.*

3         Here, the Court is presented with similar facts. First, the record indicates Defendants

4  were responsive to Plaintiff's mental health needs and complaints. Dkt. 106-1 at 69-113. *See*

5  *Cano,* 739 F.3d at 1217-1218. Plaintiff was evaluated by psychiatrists, psychologists, and other

6  mental health staff on multiple occasions, but Plaintiff refused treatment. For example, in

7  December 2016, shortly before Plaintiff was transferred out of DOC custody for criminal

8  proceedings, Plaintiff was seen by a psychiatrist after sending emergency grievances. Dkt. 106-1

9  at 69. Plaintiff was adamant about speaking with the Captain in the COA and when the

10  psychologist told Plaintiff that would not be facilitated, Plaintiff ended the encounter. *Id.*

11  Between June and September 2017, Plaintiff threatened self-harm on six occasions and was

12  placed on suicide watch. Dkt. 106-1 at 70-75, 77-79. While on suicide watch, staff provided 15-

13  minute safety checks and close observation. *Id.* Plaintiff was seen during mental health rounds

14  after each incident, but Plaintiff refused to engage with mental health providers. *Id.* at 70-78.

15  During these follow up visits, Plaintiff complained he wanted a different housing classification.

16  Dkt. 106-1 at 70-78. Plaintiff was prescribed Remeron and Effexor medication. Dkt. 106-1 at 70.

17         Defendant McIntyre also attempted to provide Plaintiff with mental health services. Dkt.

18  102 at 1-2; 106-1 at 76. Defendant McIntyre drafted an Individual Behavior Management Plan

19  ("IBMP") for Plaintiff's care, but he refused to discuss it. *Id.* at 106-1 at 76, 118-20. Plaintiff

20  refused treatment from Defendant Davis, a psychology associate. Dkt. 106-1 at 112-13.

21  Defendants Davis and Goodenough facilitated the AYP program to assist Plaintiff in progressing

22  to a less restrictive housing unit, however, Plaintiff refused to participate. Dkt. 106-1 at 111.

23

24

1    Defendant Goodenough attempted to provide mental health services to Plaintiff for

2    months several months between September 2017 and April 2018, but Plaintiff refused to

3    engage in treatment. Dkt. 106-1 at 80-82, 84, 86-96 (Plaintiff "refuse[d] to participate in the

4    [psychiatric] assessment, a chart review, and staff interviews." Defendant Goodenough noted

5    Plaintiff "appears to be attempting to use mental health reasons to get out of his program for his

6    recent staff assault" and that "[Plaintiff] continues to refuse to participate in mental health

7    services."), 100-11; 101 at 1-2. On October 12, 2017, a psychiatrist noted Plaintiff refused to

8    take his prescribed medication and refused mental health counseling. Dkt. 106-1 at 85

9    (indicating mental health staff would continue to monitor Plaintiff but there "is very little this

10   practitioner can do for him at this time[]").

11        Plaintiff argues his mental health needs are not considered in classification and

12   placement decisions. Dkt. 120 at 13-14. However, the evidence reflects Plaintiff consistently

13   refused to participate in treatment, and while mental health staff do not have authority over

14   housing assignments or classification, they do participate in referrals for transfers and CFPs as

15   appropriate. Dkt. 101 at 2; 106 at 2-3, 5; 108-1 at 139. A prisoner's refusal to accept, comply

16   with, or participate in medical treatment does not demonstrate deliberate indifference on the

17   part of the prisoner's medical providers. *See Zatko v. Rowland,* 835 F. Supp. 1174, 1179 (N.D.

18   Cal. 1993) (dismissing an Eighth Amendment claim alleging the denial of psychiatric care as

19   "factually frivolous" where plaintiff's internal prison records filed in another action showed that

20   he had refused to participate in a psychiatric evaluation); *Pinkston v. Madry,* 440 F.3d 879, 892

21   (7th Cir. 2006) (holding that no deliberate indifference occurred when an inmate refused

22   offered medical care and was uncooperative with medical staff); *Walker v. Peters,* 233 F.3d

23   494, 500 (7th Cir. 2000) (granting summary judgment in favor of prison officials on an Eighth

24

REPORT AND RECOMMENDATION - 21

1    Amendment claim where the prisoner-plaintiff refused to take a preliminary test that prison

2    officials required to confirm his diagnosis before beginning treatment, and explaining that "[a]s

3    a competent adult, [the inmate] was free to refuse treatment").

4        Second, Defendants submit evidence Plaintiff's mental health complaints and suicide

5    threats were manipulative. *See Cano,* 739 F.3d at 1217-1218. On December 22, 2016, Ryan

6    Quirk, PhD, a DOC psychologist, reported in a mental health primary encounter report: "The

7    power struggle continues with [Plaintiff] vacillating between reporting that he can be safe on the

8    unit, but only if certain conditions are met. If those conditions are not met, [Plaintiff] has made it

9    clear that he will be highly disruptive and presumably harm himself; he has made multiple

10   reports that he will engage in behavior that will require restraint bed placement, for example.

11   This behavior is indicative of a severe personality disorder, and [Plaintiff] has demonstrated such

12   behavior consistently over the years that I have worked with him." Dkt. 106 at 5; 106-1 at 69. In

13   June 2017, Dr. Quirk made similar findings, noting Plaintiff "has demonstrated a pattern of

14   frequent disruptive behavior when he disagrees with modifications to conditions of confinement

15   and/or housing placement….[Plaintiff] is refusing his current housing assignment at MCC-IMU

16   and has demonstrated that he will threaten to harm himself and/or others and/or engage in self-

17   harm and/or harm to others (and destroy property)." Dkt. 106-1 at 73.

18       Mental health staff member and non-party Ms. Khounphixay reported: "[Plaintiff] has

19   spent the majority of the time in the COA at MCC/SOU . . . 'This is for behavioral issues that are

20   considered to be with secondary incentives to manipulate his surroundings. [Plaintiff] does not

21   suffer from a major mental health diagnosis (S-2 Code).' [Plaintiff] is not programming and has

22   demonstrated that he has no desire to cooperate or maintain positive behavior (22-Negative

23   Behavioral Observations)." Dkt. 108-1 at 135-40.

24

1    On December 2017, Plaintiff declared a mental health emergency that "turned out not to

2   be an emergency. He wanted to know the outcome of his CRC." Dkt. 106-1 at 94. Plaintiff

3   "admitted that he only declared a mental health emergency to obtain an immediate response,"

4   and "was complaining about having to deal with staff while waiting for his transfer."[6] Dkt. 106-1

5   at 94.

6    Plaintiff contends Defendants Thrasher and Rainer delayed Plaintiff's transfer to MCC

7   SOU in December 2017 even though he completed 60 days of good behavior. Dkt. 120 at 13. *See*

8   *also* Dkt. 127 at ¶ 27. As a result, Plaintiff alleges this failure and refusal to provide Plaintiff

9   with adequate mental health treatment causes Plaintiff's mental health to suffer. Dkt. 120 at 13-

10  14. Defendants' evidence reflects Plaintiff's transfer to MCC SOU would be "considered" if

11  Plaintiff maintained 60 days of good behavior. Dkt. 108-1 at 139. Plaintiff disputes this fact and

12  declares Defendant Thrasher promised Plaintiff he would be transferred to the MCC SOU. Dkt.

13  127 at ¶ 14. However, it is undisputed the CFP did not state a specific custody level placement

14  within MCC SOU, and there is no indication Plaintiff would be placed in a lower custody level

15  than max custody upon transfer to MCC SOU.[7] *See id.* Moreover, Defendant Thrasher and

16  Rainer present evidence they believed Plaintiff had demonstrated he could turn his disruptive

17  behavior on and off and had concerns about his behavior in the SOU. Dkt. 106 at 5; 108 at 6.

18  Therefore, the evidence reflects the decision not to transfer Plaintiff to the MCC SOU was not

19

20

21  _____

22  [6] On December 29, 2017, the MDT committee voted to approve Plaintiff's transfer to the SOU. Dkt. 108-1 at 152. However, the same day the decision was made, the max custody committee learned Plaintiff was placed in the COA, had been very disruptive, and had received infractions. Dkt. 108 at 6.

23  [7] The MCC SOU contains housing units at several custody levels: max, close, and medium. Dkt. 106 at 4. Thus, even upon transfer to the MCC SOU, there is no indication Plaintiff was to be housed in a lower level of

24  custody or in general population.

1  made with deliberate indifference to Plaintiff's mental illness, but rather based on Defendants'

2  belief Plaintiff's behavior was disruptive and manipulative. *See Cano,* 739 F.3d at 1217-1218.

3         Third, there is also evidence Plaintiff frequently behaved disruptively and exhibited

4  violent behaviors. *See Cano,* 739 F.3d at 1217-1218. Therefore, Plaintiff could not be placed in a

5  lower custody part of the prison because he was a danger to himself, staff, and other prisoners.

6  For example, in June and July 2017, Plaintiff threatened to staff, was disruptive, attempted to

7  break the fire sprinkler, attempted to jump off his sink, smeared feces in his cell and obstructed

8  staff's view, flooded his cell, urinated on a serving cart during breakfast, threw liquid with feces

9  through a door crack and struck an officer, and tore his suicide prevention smock. Dkt. 106-1 at

10  74- 75; 108-1 at 229-33. On September 8, 2017, after threatening suicide two days earlier,

11  Plaintiff refused to leave the COA, talked loudly over other people's mental health sessions, and

12  told other inmates to kill themselves. Dkt. 106-1 at 77-78.

13         Plaintiff frequently "orchestrate[d] crises right around the time that there would be group

14  [therapy], so he was often interfering with other people's participation. Dkt. 106 at 4, Exhibit 3

15  (mental health records demonstrating Plaintiff's disruptive behavior at MCC). "Since the return

16  from Court on 06/07/17 until now, Offender Denton has accumulated 16 serious infractions to

17  include 4 staff assaults. Almost daily he is disrupting the normal run of the IMU to include

18  offender programing by constantly requiring staff intervention to deal with his behavior (view

19  behavior observations). He was given many opportunities to correct his behavior to include

20  assistance from Mental Health which he has refused." Dkt. 108-1 at 139. Plaintiff acknowledges

21  his behavior, stating "I just snap on someone. I can harm someone at any given time." Dkt. 125-1

22  at 7. Plaintiff has had approximately nine custodial assault convictions and numerous staff

23  assault infractions. Dkt. 108-1 at 21-23, 84-89.

24

REPORT AND RECOMMENDATION - 24

1    Based on the evidence before the Court, no rational jury could find an Eighth

2 Amendment violation. In sum, as in *Cano*, the evidence shows Plaintiff received numerous

3 evaluations by psychologists and mental health staff, cell front check-ins, mental health

4 treatment plans and medication throughout his incarceration. Further, he records show mental

5 health and custody staff thought some of Plaintiff's behaviors and suicide threats were

6 manipulative in nature. And lastly, the records show Plaintiff had a history of violent and

7 threatening behavior which led to a restrictive housing assignment. And lastly, *See Cano,* 739

8 F.3d at 1217-1218. On such a similar record, no reasonable trier of fact could find Defendants

9 Thrasher, Goodenough, Davis, and Rainer were deliberately indifferent to Plaintiff's mental

10 health needs.

11    Plaintiff also alleges Defendants Thrasher, Rainer, and Davis chose a medically

12 unacceptable course of treatment in conscious disregard of an excessive risk based on the mental

13 health evaluation conducted by Dr. Eusanio. Dkt. 126 at 19 (citing *Jackson v. McIntosh,* 90 F.3d

14 330, 332 (9th Cir. 1996)).[8]

15    The undisputed facts show Dr. Eusanio's report stated the time Plaintiff has spent in

16 solitary confinement has exacerbated his previously mental health issues, and caused the onset of

17 a new mental illness known as "SHU syndrome." Dkt. 127 at ¶ ¶ 9, 10, Exhibit A at 30, 34-35.

18 Dr. Eusanio indicated because of Plaintiff's isolation, Plaintiff shows "increasingly poorer

19

20    [8] Plaintiff points to a district court case where the court found risks posed by solitary confinement on
mentally ill prisoners who are particularly vulnerable because the conditions may exacerbate existing mental illness.
21 Dkt. 120 at 14 (citing *Madrid v. Gomez,* 889 F. Supp. 1146, 1265-66 (N.D. Cal. 1995)). *See also* Dkt. 126 at 14-15.
However, the circumstances presented in *Madrid* are entirely different than those here. In *Madrid*, the plaintiffs'
22 placement in solitary confinement interfered with prisoners' ability to obtain adequate mental health treatment and
there were systemic deficiencies at the facility, *e.g.,* deficiencies in mental health programming, screening, staffing
levels, and accountability, which contributed to an overreliance on solitary confinement as a means of controlling
23 prisoners with serious mental illness. *Madrid,* 889 F. Supp. at 1256-66; *Coleman v. Brown,* 2013 WL 6071977 (E.D.
Cal. Nov. 12, 2013). Here, Plaintiff fails to allege or present any evidence of similar systemic deficiencies in the
24 mental treatment offered to prisoners, particularly those housed in max custody.

1   response to commands, redirection, correction, persuasion, and even behavior management

2   approaches which are usually effective." Dkt. 127 at ¶ 11, Exhibit A at 35.

3           Defendant Rainer declares the mental health staff considered Dr. Eusanio's report, along

4   with mental health records and assessments of DOC staff and others who are familiar with

5   Plaintiff and work around him on a regular basis. Dkt. 106 at 8. Defendant Rainer declares

6   Plaintiff has been offered and received appropriate mental health services and care. *Id.* at 8-9.

7           Ultimately, Plaintiff has shown, at best, a difference of opinion about the adequacy of the

8   mental health care treatment he received. Showing only a difference of opinion does not allow

9   him to withstand defendants' motion for summary judgment on his Eighth Amendment claim nor

10  does it show that he received medically acceptable mental health treatment. *See Cano v. Taylor*,

11  739 F.3d 1214, 1217 (9th Cir. 2014) (a difference of opinion as to medical treatment "is not

12  actionable"). To the extent Plaintiff alleges the treatment he was offered did not help him, a

13  prison official does not exhibit deliberate indifference to a serious medical need simply because

14  he or she prescribes a course of treatment which is not effective. Rather, "to prevail on a claim

15  involving choices between alternative courses of treatment, a prisoner must show that the chosen

16  course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in

17  conscious disregard of an excessive risk to [the prisoner's] health.'" *Toguchi v. Chung,* 391 F.3d

18  1051, 1058-60 (9th Cir. 2004) (internal citations omitted). Plaintiff's disagreement with

19  Defendants about the type of mental health treatment or the classification status he requires does

20  not reflect a conscious disregard of Plaintiff's serious medical needs. *See McGuckin*, 974 F.2d

21  1050 (a defendant "must purposefully ignore or fail to respond to a prisoner's pain or possible

22  medical need in order for deliberate indifference to be established"). While Plaintiff did not

23  receive the response he wanted from Dr. Eusanio's report and disagrees with the mental health

24

1  treatment he has been offered, he has not demonstrated the mental health treatment he received

2  fails to comport with minimum standards.

3      Plaintiff has failed to present evidence as to how Defendants acted to deprive him of the

4  minimal civilized measure of life's necessities to support his claim. Plaintiff has failed to present

5  evidence of any deficiencies which preclude access to adequate mental health treatment. Given

6  the undisputed facts showing Defendants consistently provided Plaintiff with mental health

7  treatment despite his continued refusal, the Court cannot find Defendants acted with deliberate

8  indifference. The Court recommends granting Defendants' Motion as to this claim and denying

9  Plaintiff's Motion.

10          ***b.  COA***

11      Plaintiff alleges Defendants Thrasher, Bayer, and Moore violated Plaintiff's Eighth

12  Amendment rights based on the conditions of the COA cells. Dkt. 116. Plaintiff alleges

13  unsanitary conditions and deprivation of hygiene needs. Dkt. 116; Dkt. 120 at 17.

14      "Subjection of a prisoner to lack of sanitation that is severe or prolonged can constitute

15  an infliction of pain within the meaning of the Eighth Amendment." *Anderson v. County of Kern,*

16  45 F.3d 1310, 1314 (9th Cir. 1995). However, temporary placement in a safety cell to deprive an

17  inmate of the means of harming himself is permissible under the Eighth Amendment. *Id.*

18      *1.  Plaintiff's Evidence*

19      Plaintiff's was assigned to dry cells without a permanent toilet on several occasions:

20  (1) December 26, 2017;[9] (2) May 14, 2018; (3) May 30, 2018 to June 5, 2018; (4) June 6, 2018 to

21

22  _____

23      [9] The evidence also reflects Plaintiff was in a WSP COA cell from December 28, 2017 to January 2, 2018.
    Dkt. 120, Exhibit 6. However, the Court previously found Plaintiff failed to exhaust his administrative remedies as to
    the events on December 31, 2017. *See infra.* This finding also includes any conditions of confinement claims related

24  to the lack of a toilet or sanitation during the same time period.

July 3, 2018; (5) July 5, 2018 to July 11, 2018; (6) July 24, 2018; and (7) July 25, 2018 to July 27, 2018. Dkt. 120, Exhibit 6 at 134 (Interrogatory No. 2). In his sworn declaration, Plaintiff states the dry cells at WSP have a 1-foot-by 8-inch hole in the ground covered by a metal sheet with a few small holes (a "grate") for inmates to urinate in. Dkt. 127 at ¶ 18. Plaintiff states the grate system can only be "flushed" by a guard. *Id.*

Plaintiff states "I have never heard of or been given a portable toilet, and I don't know of any inmates who were even given the option of using a portable toilet." *Id.* Plaintiff states he defecated on the grate, but the feces do not fit through the grate. *Id.* Plaintiff alleges on multiple occasions, correctional officers have refused or neglected to flush the toilet, forcing Plaintiff to stay in a 9-by-12-foot room without good ventilation while his waste "festered on the floor." Plaintiff states he "had to use my bare hands to break up my feces into smaller pieces and push them in between the bars so it goes down the hole and out of the room. The grate would smell for hours." *Id.* Plaintiff states without a sink, he had no way to clean his hands. *Id.* Plaintiff states "guards" provided him with toilet paper but not wipes because wipes will clog the toilet and Plaintiff is not permitted to have any items in the COA cell. *Id.* Plaintiff states he had to eat food with feces on his hands. *Id.* Plaintiff states he repeatedly complained about these conditions to various staff members, including Defendants Moore and Bayer. *Id.* Plaintiff states he has access to water when it is given to him by a guard. *Id.*

   2.  *Defendants' Evidence*

In response, Defendants submit the declaration of non-party Chris Bowman, the Associate Superintendent at WSP. Dkt 94, Bowman Dec. A person is placed in the COA if he or she has been assessed as unsafe in a less restrictive setting. Dkt. 94 at 1-2. The COA is used for the placement of incarcerated individuals who pose a risk to themselves or have a mental health concern resulting in a grave disability. Dkt. 94 at 1-2. Placement in the COA is determined by a

1   mental health provider based upon an assessment by health services. Dkt. 94 at 1-2. Individuals

2   from any custody level within the prison may be placed in the COA because it is a mental health

3   determination made for an individual's safety and not a classification or custody decision. Dkt.

4   94 at 2. Individuals may be placed in the COA for these reasons: risk of self-harm; risk of

5   suicide; self-harm attempt; suicide attempt; or severe psychiatric decompensation. Dkt. 94 at 2.

6   Individuals in the COA are on varying levels of observation, with some on continuous

7   observation with an officer monitoring that individual one-on-one at all times. Dkt. 94 at 2.  The

8   evidence shows Defendant Thrasher determined Plaintiff met the requirements to remain on max

9   custody status for his and other's safety. *See* Dkt. 108.

10          3.   *Analysis*

11          First, Plaintiff has not demonstrated any of the named Defendants in this action

12  personally participated in the decision to assign Plaintiff to a COA cell, denied him a portable

13  toilet upon request, or denied Plaintiff sanitation items. While Plaintiff generally alleges he was

14  moved into a COA cell on numerous occasions, Plaintiff fails to specify or present any evidence

15  demonstrating who made the decision to transfer him into the COA cell or why they did so. *See*

16  Dkt. 120, 126, 127. Plaintiff also fails to identify any particular incidents when any named

17  Defendant denied him a portable toilet or sanitation items. *Id.* Rather, his allegations are vague

18  and generalized and do demonstrate how any Defendant subjected Plaintiff to a severe or

19  prolonged deprivation of sanitation. *See Anderson,* 45 F.3d at 1314. Plaintiff's fails to draw the

20  necessary connection between the named Defendants' action and the alleged constitutional

21  violations. The lack of factual allegations with respect to who made the decisions to place

22  Plaintiff in the COA cells or otherwise deprive him of sanitation amounts to a failure to state an

23  Eighth Amendment claim. *See Iqbal*, 556 U.S. at 676 ("Because vicarious liability is

24

1   inapplicable to ... § 1983 suits, a plaintiff must plead that each Governmental-official defendant,

2   through the official's own individual actions, has violated the Constitution."); *Taylor v. List*, 880

3   F.2d 1040, 1045 (9th Cir. 1989) (holding that a defendant is liable under § 1983 "only upon a

4   showing of personal participation by a defendant."); *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir.

5   1991) ("The inquiry into causation must be individualized and focus on the duties and

6   responsibilities of each individual defendant whose acts or omissions are alleged to have caused

7   a constitutional deprivation."). Plaintiff must provide more than an "unadorned, the-defendant-

8   unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

9        In addition, Plaintiff fails to present evidence demonstrating Defendants knew Plaintiff

10  faced a substantial risk of harm and disregarded such a risk with respect to the sanitation

11  conditions in the COA cells. Plaintiff does not demonstrate how any of the named Defendants

12  had personal knowledge of Plaintiff's serious harm or risk of serious harm, nor explain what

13  actions any of the named Defendants failed to take which rose to deliberate indifference.

14       Where an inmate is "confined to the dry cell to serve a legitimate penological interest and

15  not for the purpose of punishment, the culpability component of deliberate indifference analysis

16  is clearly lacking." *Jihad v. Wright*, 124 F.3d 204 (7th Cir. 1997). In *Jihad, t*he Seventh Circuit

17  held the placement of a prisoner into a dry cell for three days, during which he was unable to

18  wash his hands and denied personal hygiene items, did not violate the Eighth Amendment,

19  particularly since the prisoner had been "confined to the dry cell to serve a legitimate

20  penological interest." *Jihad v. Wright,* 124 F.3d 204 (7th Cir. 1997).

21       The temporary placement in a safety cell to deprive an inmate of the means of

22  harming himself is permissible under the Eighth Amendment. *Anderson v. County of Kern*, 45

23  F.3d 1310, 1314 (9th Cir. 1995). In *Anderson,* the Ninth Circuit held:

24

1    Prison officials have to have some means of controlling violent or self-destructive
2    inmates temporarily until the episode passes, and as the plaintiffs' own expert
     testified, it is difficult to distinguish between violent, mentally healthy inmates and
3    violent, mentally disturbed ones. Similarly, in an emergency, prison officials are
     not culpable when they put an inmate who imminently threatens or attempts suicide
4    temporarily in a place where he cannot hurt himself. In light of the safety concerns
     underlying use of the safety cell, the plaintiffs' evidence is not sufficient to compel
5    an inference that the defendants are "knowingly and unreasonably disregarding an
     objectively intolerable risk of harm" and will continue to do so in the future. The
     plaintiffs accordingly have failed to establish the subjective as well as the objective
6    components of an Eighth Amendment prison conditions claim for injunctive relief.

7    *Anderson*, 45 F.3d at 1315.

8          Plaintiff has not presented evidence upon which a reasonable jury could find that

9    Defendants' response to the unsanitary conditions displayed a sufficiently culpable state of mind,

10   i.e., deliberate indifference. To the contrary, the record shows that the confinement was

11   necessary for inmate safety in the face of Plaintiff's self-harm and/or threats of self-harm and it

12   lasted only for the length of time necessary to restore order. *See* Dkt. 94 at 3-4. Defendants

13   declare, and Plaintiff does not present evidence to dispute, Plaintiff's placement in the COA cell

14   was to allow for observation and prevent suicide or injury, such as inmates standing on the toilet

15   or sink. Dkt. 94 at 3-4; 106-1 at 72. Plaintiff argues in a conclusory manner, without evidentiary

16   support, it is "utterly implausible that an inmate in such a cell would climb onto a toilet with the

17   intent to jump off, for instance, without drawing the attention of the watching guard." Dkt. 126 at

18   17. However, the undisputed evidence, when viewed in a light most favorable to Plaintiff, does

19   not establish an Eighth Amendment violation. for a prison official to be deliberately indifferent

20   to a prisoner's conditions of confinement, he must "knowingly and unreasonably disregard[ ] an

21   objectively intolerable risk of harm." *Farmer*, 511 U.S. at 846; *accord Anderson*, 45 F.3d at

22   1314. Thus, "prison officials who actually [know] of a substantial risk to inmate health or safety

23

24

1  may be found free from liability if they [respond] reasonably to the risk, even if the harm

2  ultimately [is] not averted." *Farmer*, 511 U.S. at 844.

3          Accordingly, there is no dispute as to any material fact and Defendants are entitled to

4  summary judgment. The Court recommends granting Defendants' Motion as to this claim and

5  denying Plaintiff's Motion.

6                              **c.  *Verbal Harassment***

7          Plaintiff alleges he was verbally mocked and ridiculed by Defendants. Dkt. 116 at 11-12.

8  Generally speaking, allegations of verbal threats and/or verbal harassment alone are insufficient

9  to state an Eighth Amendment claim. *See Farmer,* 511 U.S. at 834; *See Oltarzewski v. Ruggiero*,

10  830 F.2d 136, 139 (9th Cir. 1987).

11         Here, Plaintiff has provided conclusory statements alleging he was verbally mocked and

12  ridiculed by various DOC staff. *See* Dkt. 116. Plaintiff declares Defendant Goodenough and

13  McKinney told Plaintiff he deserves to "rot in the hole". Dkt. 127 at ¶ 12, 13. Plaintiff alleges

14  staff called him "retarded" and "dumb," including while he was assigned to the COA. *Id.* at ¶ 15,

15  21. As threats and verbal harassment do not constitute a constitutional violation, Plaintiff has

16  failed to state an Eighth Amendment claim based on Defendants allegedly verbally mocking and

17  ridiculing Plaintiff.

18         To the extent Plaintiff alleges the verbal harassment violated the Eighth Amendment

19  because it caused him psychological harm, in light of his mental health issues, an Eighth

20  Amendment claim based on harassment requires proof both the plaintiff suffered psychological

21  damage and defendant's actions were "calculated to" cause such damage. *Keenan v. Hall,* 83

22  F.3d 1083, 1092 (9th Cir. 1996). Here, Plaintiff has not presented any evidence demonstrating

23  culpability of Defendants state of mind. There is no affirmative evidence Defendants intended to

24

1  cause Plaintiff harm. *See* Dkt. 120, 126; *Celotex*, 477 U.S. at 324 (the nonmoving party must go

2  beyond his or her own pleadings and designate "specific facts showing that there is a genuine

3  issue for trial").

4        Accordingly, the Court recommends Defendants' Motion be granted, and Plaintiff's

5  claim that he was verbally mocked and ridiculed be dismissed.

6        **IV.    First Amendment – Incoming Mail Rejection**

7        Plaintiff alleges his First Amendment rights were violated when Defendant O'Reilly

8  rejected an incoming issue of "Bottles and Modelz". Dkt. 116 at 10.

9        The evidence shows in June 2017, Plaintiff purchased a "Bottles and Modelz" magazine.

10  Dkt. 127 at ¶ 8. According to the declaration of Defendant O'Reilly, the particular issue of this

11  magazine was rejected because it was previously banned for containing sexually explicit

12  material. Dkt. 105 at 2. Plaintiff did not make arrangements for disposal of retention of the issue

13  per DOC policy. Dkt. 105 at 2; 105-1 at 13.

14        The DOC policy in effect at the time the magazine was rejected stated, "[m]ail to or from

15  offenders will be rejected based on legitimate penological interests and per Unauthorized Mail

16  (Attachment 1)." Dkt. 105 at Exhibit 1. Department of Corrections Policy 540.100, Revision

17  Date 12/27/2017. DOC Policy 450.100, Attachment 1 states unauthorized mail includes sexually

18  explicit written materials. *See id.*

19        Courts have held "no constitutional right is violated when prison staff refuse to deliver

20  sexually explicit materials to an inmate because it is reasonably related to penological

21  interests[.]" *Grenning v. Klemme*, 34 F. Supp. 3d 1144, 1155 (E.D. Wash. 2014); *see*

22  *Bahrampour v. Lampert*, 356 F.3d 969, 979 (9th Cir. 2004) (finding prison officials may prohibit

23  receipt of sexually explicit materials in light of concerns about preventing the sexual harassment

24

1  of prison guards and other inmates); *Frost v. Symington*, 197 F.3d 348, 357 (9th Cir. 1999)

2  (applying the Supreme Court's *Turner* test to find a regulation prohibiting receipt of sexually

3  explicit images in the prison did not unconstitutionally abridge the inmate's First Amendment

4  rights).

5         Here, Defendant O'Reilly rejected a magazine addressed to Plaintiff containing sexually

6  explicit language pursuant to a DOC policy which is in place to protect the interests of

7  penological interests. *See* Dkt. 105 at 2, Exhibit 1. While the magazine was not included as

8  evidence because Plaintiff did not make arrangements for its retention, Plaintiff does not assert

9  the magazine was not sexually explicit.[10] *See* Dkt. 127. As the magazine contained sexually

10  explicit language, Defendants' rejection of the magazine did not violate Plaintiff's First

11  Amendment rights. *See Grenning*, 34 F. Supp. 3d at 1155.

12        Accordingly, the Court recommends Defendants' Motion be granted as to Plaintiff's

13  claim that his First Amendment rights were violated when Defendants' rejected an incoming

14  magazine containing sexually explicit language. The Court recommends denying Plaintiff's

15  Motion as to his mail rejection claim.

16  **V.    Personal Participation**

17        Plaintiff alleges Defendant Russell is a DOC supervisor. *See* Dkt. 116 at 3; Dkt. 103.

18  Plaintiff makes no other factual allegations against Defendant Russell. *See id.* Section 1983

19  supervisory liability cannot be based on *respondeat superior. See Monell v. New York City Dep't*

20  *of Social Servs.*, 436 U.S. 658, 691 (1978). A § 1983 action may not be brought against a

21

22  ──────────────

23        [10] In the Complaint, Plaintiff contends the magazine was the magazine was rejected because it was an "African American" magazine. Dkt. 116. However, Plaintiff offers no evidentiary support for this contention, and therefore, there is no disputed issue of material fact. *See Celotex*, 477 U.S. at 324 (the nonmoving party must go

24  beyond his or her own pleadings and designate "specific facts showing that there is a genuine issue for trial").

1    supervisor on a theory that the supervisor is liable for the acts of his or her subordinates. *See*

2    *Polk County v. Dodson*, 454 U.S. 312, 325 (1981). Further, to state a claim against any

3    individual Defendant, Plaintiff must allege facts showing the individual Defendant participated

4    in or directed the alleged violation or knew of the violation and failed to act to prevent it. *See*

5    *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998), *cert. denied,* 525 U.S. 1154 (1999).

6    Because vicarious liability is inapplicable to a § 1983 suit, Plaintiff must plead each Defendant,

7    through his or her own individual actions, has violated Plaintiff's constitutional rights. *Ashcroft*

8    *v. Iqbal*, 556 U.S. 662 (2009).

9        Here, Plaintiff alleges, in a conclusory manner, Defendant Russell was either the

10   Superintendent or the Deputy Director of Prison Command A for the DOC and had supervisory

11   responsibility over all other Defendants and the "ability to make policy for the State of

12   Washington." Dkt. 116 at 3. Plaintiff fails to allege facts showing Defendant Russell participated

13   in or directed subordinates to commit the alleged violations. He also fails to specify how

14   Defendant Russell was aware Plaintiff's rights were allegedly being violated. *See id*.

15       As Plaintiff has failed to allege facts showing Defendant Russell personally participated

16   in the alleged constitutional violations, Plaintiff has failed to state a claim against Defendant

17   Russell. Accordingly, the Court recommends Defendants' Motion be granted and Plaintiff's

18   Motion be denied as to Defendant Russell.

19       **VI.    Qualified Immunity**

20       Defendants also argue they are entitled to qualified immunity on plaintiff's damages

21   claim. Dkt. 121. However, because the Court finds Defendants' Motion for Summary Judgment

22   should be granted on Plaintiff's damages claim on alternative grounds, this argument need not be

23   addressed.

24

1

2       **VII.    Injunctive Relief**

3           In addition to seeking monetary damages, Plaintiff seeks an order placing him in a less

4       secure prison facility, mental health treatment for non-parties, and the transfer of non-parties to

5       mental health treatment facilities. Dkt. 116 at 14-16.

6           Because the Court recommends granting Defendants' Motion for Summary Judgment on

7       all pending claims, Plaintiff cannot establish the likelihood of success on any pending claim,

8       making injunctive relief unavailable. *See Global Horizons, Inc. v. U.S. Dep't of Labor*, 510 F.3d

9       1054, 1058 (9th Cir. 2007) (quoting *Arcamuzi v. Cont'l Air Lines, Inc.*, 819 F.2d 935, 937 (9th

10      Cir. 1987)) ("A moving party must, at an 'irreducible minimum,' demonstrate some chance of

11      success on the merits. When, as here, a party has not shown any chance of success on the merits,

12      no further determination of irreparable harm or balancing of hardships is necessary.").

13      Accordingly, the Court recommends denying Plaintiff's request for injunctive relief and granting

14      Defendants' Motion.

15      **E.    ADA and RA**

16          Plaintiff alleges Defendant DOC[11] violated Plaintiff's rights under the ADA and RA. Dkt.

17      116 at 12-14.

18          "To state a claim of disability discrimination under Title II of the ADA, the plaintiff must

19      allege four elements: (1) the plaintiff is an individual with a disability, (2) the plaintiff is

20      otherwise qualified to participate in or receive the benefit of some public entity's services,

21      programs, or activities, (3) the plaintiff was either excluded from participation in or denied the

22

23      _____

24          [11]While Defendant DOC is not liable under § 1983, the DOC is an entity capable of being sued under Title
II of the ADA or the RA. *See Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1141 (9th Cir. 2001).

benefits of the public entity's services, programs, or activities, or was otherwise discriminated

against by the public entity, and (4) such exclusion, denial of benefits, or discrimination was by

reason of the plaintiff's disability." *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002);

*Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001), *as amended on denial of reh'g*

(Oct. 11, 2001); 42 U.S.C. § 12132. Plaintiff's RA claim is analyzed under those same standards.

*Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1135-36 (9th Cir. 2001).

Defendants argue Plaintiff's ADA and RA claims challenge the extent and quality of his

medical care, and therefore do not state claims. Dkt. 121. The seminal Ninth Circuit case

addressing ADA and RA claims for inadequate treatment in the prison context is *Simmons v.

Navajo Cty., Ariz.,* 609 F.3d 1011, 1014 (9th Cir. 2010). In *Simmons,* a prisoner was denied

outdoor recreation before being placed on suicide watch because he was a juvenile. *See id.* The

Ninth Circuit held the plaintiffs "failed to adduce any evidence that the restriction was anything

but a legitimate effort to protect [him] from self-harm," the court concluded that "such denial

was not because of his depression, but due to a jail policy restricting the activities of inmates on

suicide watch." *Id.* at 1021. Moreover, the court concluded that to the extent the plaintiffs alleged

the defendant violated the ADA by depriving their son of "programs or activities to lessen his

depression," such argument is not actionable under the ADA since "the ADA prohibits

discrimination because of disability, not inadequate treatment for disability." *Id.* at 1022.

Plaintiff alleges his claims are "more than a disagreement about his mental health

treatment and classification." Dkt. 129 at 9. Plaintiff alleges he "has been discriminated against

on the basis of his disability as he has been punished and infracted for behavior he exhibits

because of his mental illness and has been made to live in COA cells without a toilet during

mental health crises that inmates without mental health illnesses do not have to live in." *Id.* This

is merely a distinction, and not the basis for a separate claim which is actionable under the ADA or RA. Plaintiff's ADA and RA claim is based squarely on Defendants' alleged failure to provide adequate treatment for his mental illness. *See* Dkt. 116 at 13 (Plaintiff alleges he was excluded from reasonable accommodations and services when Defendants denied Plaintiff mental health treatment.). Hence, Plaintiff's allegations about inadequate medical care are not actionable under the ADA or RA. *See Simmons,* 609 F.3d at 1014; *See, e.g., Alexander v. Tilton,* 2009 WL 464486, at *7 (E.D. Cal. Feb. 24, 2009) (collecting cases and noting that "other courts have found that the ADA and [the Rehabilitation Act] do not create a federal cause of action for prisoners challenging the medical treatment provided for their underlying disabilities"); *Burger v. Bloomberg,* 418 F.3d 882, 883 (8th Cir. 2005) (holding that claims pursuant to the ADA or the Rehabilitation Act "cannot be based on medical treatment decisions"); *Grzan v. Charter Hosp. of Northwest Indiana,* 104 F.3d 116, 121–22 (7th Cir. 1997) ("Allegations of discriminatory medical treatment do not fit into the four-element framework required by section 504 [of the Rehabilitation Act]."); *Figueira ex rel. Castillo v. Cnty. of Sutter,* 2015 WL 6449151, at *8–9 (E.D. Cal. Oct. 23, 2015) (dismissing ADA/RA claims arising from suicide of mentally ill inmate following allegedly inadequate health care in custody; noting that "[t]he defendants cannot have violated the ADA by failing to attend to the medical needs of disabled prisoners").

Accordingly, Defendants' Motion should be granted as to Plaintiff's ADA and RA claims against Defendant DOC and Plaintiff's Motion should be denied.

## CONCLUSION

Based on the foregoing, the undersigned recommends Defendants' Motion for Summary Judgment be granted and all claims be dismissed. The undersigned recommends Plaintiff's

1 Motion for Summary Judgment be denied. The Court recommends Plaintiff's Motion Re Lack of

2 Access to Attorney (Dkt. 133) be denied.

3     Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

4 fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P.

5 6. Failure to file objections will result in a waiver of those objections for purposes of *de novo*

6 review by the district judge. *See* 28 U.S.C. § 636(b)(1)(C). Accommodating the time limit

7 imposed by Fed. R. Civ. P. 72(b), the clerk is directed to set the matter for consideration on April

8 10, 2020, as noted in the caption.

9

10     Dated this 20th day of March, 2020.

11

12                                                 

13                             David W. Christel
                            United States Magistrate Judge

REPORT AND RECOMMENDATION - 39